UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X
                                                 :

BRYAN LAMBERT,                        :
                                                 :

                        Plaintiff,     :

                                                 :

             - against -              :

                                                 :

TRUMP INTERNATIONAL HOTEL AND    :
TOWER, FRANCIS CALDERON, AND      :
THOMAS AHEARN,                   :
                                                 :

                       Defendants.   :
                                                 :
--------------------------------------------------------X

15-CV-582 (VSB)

**OPINION & ORDER**

Appearances:

Marshall B. Bellovin
Vincent J. Roldan
Lily Anne Ockert
Ballon Stoll Bader & Nadler, P.C.
New York, New York
*Counsel for Plaintiff*

Diane Windholz
Orla J. McCabe
Jackson Lewis, P.C.
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

         Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq* ("Title VII"), the Americans with Disabilities Act ("ADA"), the New York State

Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL") and the New York City Human

Rights Law, N.Y. City Admin. Code § 8-107 *et seq.* ("NYCHRL") against Trump International

Hotel and Tower ("Trump"), Francis Calderon, and Thomas Ahearn (the "Individual

Defendants" and collectively with Trump, "Defendants").  Before me is Defendants' motion for

summary judgment. For the reasons stated below, Defendants' motion for summary judgment is GRANTED as to all of Plaintiff's federal claims and NYSHRL claims, and those claims are dismissed with prejudice. Because I dismiss the federal claims before me, and because Plaintiff's NYCHRL claims are governed under a lower threshold of proof than their federal counterparts, I decline to exercise supplemental jurisdiction over Plaintiff's claims under the NYCHRL. Therefore, Plaintiff's NYCHRL claims are dismissed without prejudice to Plaintiff filing those claims in state court.

## I.    **Background**[1]

Lambert is a 29-year-old African-American male of Jamaican national origin. (Pl.'s 56.1 ¶ 6; Lambert Aff. ¶ 2.)[2] Lambert suffers from a skin condition known as "barber's itch" or "Folliculitis Barbae Traumatica." (Pl.'s 56.1 ¶ 7.) Lambert was hired in December 2011 as a House Officer[3] at Trump. (*Id.* ¶ 8.)

Trump is a high-rise building located at 1 Central Park West. The building contains both hotel rooms and residential condominiums. (*Id.* ¶ 1.) Trump maintains an Equal Employment Opportunity ("EEO") Policy, (McCabe Aff. Ex. D.),[4] and Lambert received a copy of the EEO Policy, which he signed prior to commencing his employment at Trump, (Pl.'s 56.1 ¶ 9; McCabe Aff. Ex. F).

The Individual Defendants were also employed at Trump while Lambert was a House

---

[1] The facts in this background section are undisputed unless otherwise noted.

[2] "Pl.'s 56.1" refers to Plaintiff's Response to Defendants' Rule 56.1 Statement of Facts, filed October 14, 2016. (Doc. 51.) References to individual paragraphs of Plaintiff's 56.1 Statement are to Defendants' statements, Plaintiff's responses, or both. "Lambert Aff." refers to the Affidavit of Bryan Lambert in Opposition to Defendants' Motion for Summary Judgment, filed October 14, 2016. (Doc. 49.)

[3] Plaintiff's amended complaint ("Amended Complaint") describes the title of "House Officer" as a security guard. (Doc. 39 ("Am. Compl.") ¶ 21.)

[4] "McCabe Aff." refers to the Affidavit of Orla J. McCabe in Support of Defendants' Motion for Summary Judgment, filed September 12, 2016. (Doc. 46.)

Officer. Ahearn is employed as a House Officer, (Pl.'s 56.1 ¶ 3); Calderon is employed as an Assistant Front Office Manager, (*id.* ¶ 4). Ahearn and Plaintiff are co-workers. (*Id.* ¶ 3.) Ahearn and Calderon also received and signed copies of the EEO Policy. (*Id.* ¶ 5; McCabe Aff. Ex. E.)

**A.**     *Ahearn's Termination and Reinstatement*

On April 23, 2013, Lambert met with Keisha Purcell Midouin, the Assistant Director of Human Resources at the time, to discuss comments that Ahearn made from January 2013 to April 2013. (Pl.'s 56.1 ¶ 11). At this meeting, Lambert told Midouin that "(1) in January 2013, when speaking with another House Officer about the recent termination of an Engineering Apprentice, Mr. Ahearn commented that the Apprentice would not have been terminated if he was black; (2) in mid-April 2013, while discussing the Boston marathon bombing, Mr. Ahearn purportedly made a derogatory reference about black people shooting one another; (3) on April 20, 2013, Mr. Ahearn allegedly described House Officer Michael Wiafe, as quiet unless 'you are African;' and (4) that same evening, Mr. Ahearn told Plaintiff and another House Officer 'see you later my dark skinned friends.'" (*Id.* ¶ 12 (quoting McCabe Aff. Ex. G).)

Midouin immediately commenced an investigation into each of these allegations, interviewing the witnesses identified by Lambert. (*Id.* ¶ 13.) Based on this investigation, Trump terminated Ahearn's employment on May 8, 2013. (*Id.* ¶ 19.) Thereafter, the New York Hotel & Motel Trades Council, AFL-CIO (the "Union") grieved Ahearn's termination. (*Id.* ¶ 20; McCabe Aff. Ex. N.) On May 10, 2013, Ahearn's discharge was converted to a time-served suspension without pay, and he returned to work as a House Officer at Trump. (Pl.'s 56.1 ¶¶ 20–21.) Following Ahearn's reinstatement, Lambert asked Deirdre Rosen, the Vice President of Human Resources, if Ahearn's shift could be changed because Lambert was uncomfortable

working with him.  (*Id.* ¶ 21.)  In response, Rosen explained that she could not change Ahearn's shift because she did not have the power to do so, (*id.* ¶ 22; Lambert Dep. Tr. 107:10-15),[5] but advised Plaintiff that there were two open shifts that he could transfer into if he did not want to work on the same shift as Ahearn, (Pl.'s 56.1 ¶ 23).  Lambert did not request or apply for a shift change.  (Lambert Dep. Tr. 114:20-116:14.)

### B.    *Lambert's Notice of Discrimination*

On or about August 26, 2013, Lambert filed a charge of discrimination with the EEOC (the "EEOC Charge"), and notice of the EEOC charge was served on Trump on September 5, 2013.  (Pl.'s 56.1 ¶ 42; McCabe Aff. Ex. X.)  In the EEOC Charge, Lambert alleged that Ahearn made racial comments toward him starting in April 2013, and that Lambert was being retaliated against for complaining about Ahearn and the remarks.  (McCabe Aff. Ex. X.)

### C.    *Lambert's Write-Up for Excessive Absences*

On October 14, 2013, Sal Blando, the Director of Security at Trump, issued Lambert a warning for continued excessive absences.  (Pl.'s 56.1 ¶ 47; McCabe Aff. Ex. AA.)  Lambert does not dispute that he was absent for the days listed in the warning.  (Pl.'s 56.1 ¶ 49.)  Blando had previously advised Lambert in April 2013 that he had "exhausted all of [his] paid sick days," and that "[a]ny employee who abuses sick leave benefits shall be subject to disciplinary action up to and including termination."[6]  (McCabe Aff. Ex. Z.)  After receiving this warning, Lambert called out sick on July 13, 2013, August 8, 2013, and August 26, 2013; Lambert claims he had a doctor's note for each of these days.  (Pl.'s 56.1 ¶ 46.)

---

[5] "Lambert Dep. Tr." refers to the Transcript of the March 2, 2016 Deposition of Bryan Lambert.  (Doc. 46-1.)

[6] On January 2, 2013, Rosen "issued a memorandum to all associates reminding them of [Trump's] time and attendance policy," (Pl.'s 56.1 ¶ 44), which stated that "[e]xcessive sick calls (i.e. more than our allotted sick days) will result in disciplinary action," (McCabe Aff. Ex. Y).

### D. *Lambert's Requests for Vacation, Overtime, and Use of a Hotel Room*

Vacation scheduling at Trump is governed by a Collective Bargaining Agreement, which instructs that "vacation must be made before January 15th or by May 1st for any remaining weeks available." (*Id.* ¶ 51.) Vacation days are granted in accordance with seniority and the date the request was made. (*Id.*) Lambert acknowledges that he took vacation on December 16 and December 18, 2013. (*Id.* ¶ 53.) According to Trump's records, Ahearn took two vacation days in December 2013: December 8 and December 29. (*Id.* ¶ 56.)

Trump employees are also offered the opportunity to work overtime based on seniority. (Getman Decl. ¶ 14.)[7] The employee who accepts the offer of overtime first is given the opportunity to work the overtime. (*Id.*) Lambert alleges that he made six requests to work overtime shifts from December 2013 to March 2014, all of which were denied. (Lambert Aff. ¶ 30.) From September 2013 to March 2014, Trump's records indicate that Lambert worked 107.75 hours of overtime; Ahearn worked 98 hours of overtime; and Benabou worked 122.25 hours of overtime. (Supp. Getman Decl. ¶ 4–6.)[8] Lambert maintains that Trump's figures are not an accurate reflection of his actual overtime because many of Lambert's tasks during his regular shift are factored into this figure. (Lambert Aff. ¶ 9.)

Trump also maintains a policy of providing employees with use of a hotel room to sleep if an employee works two consecutive shifts separated by only a few hours, provided that the hotel is not fully occupied. (Pl.'s 56.1 ¶ 59.) According to Lambert, Benabou told Lambert during this time that "he was going upstairs to sleep because he got a hotel room," (Lambert

---

[7] "Getman Decl." refers to Declaration of Helen Getman in Support of Defendants' Motion for Summary Judgment, filed September 12, 2016. (Doc. 43.)

[8] "Supp. Getman Decl." refers to the Declaration of Helen Getman in Further Support of Defendants' Motion for Summary Judgment, filed November 7, 2016. (Doc. 55.)

Dep. Tr. 155:16-22), which indicated to Lambert that Benabou's request was approved. However, Trump's records do not reflect that Benabou was given a hotel room in December 2013.  (Getman Decl. ¶ 17.)

### E. Lambert's Locker Is Vandalized

On or about March 6, 2014, Lambert forwarded a letter to Rosen complaining that on February 23, 2014, "he found his locker open and a sticker of a face in black and white color was taped to [it]."  (Pl.'s 56.1 ¶ 62.)  In the letter, Lambert advised Rosen that he had complained about the situation to Midouin and asked for a different locker.  (*Id.*)  In response to his request, Midouin had stated that there were no lockers available, but that she could provide him with a new lock.  (*Id.* ¶¶ 62–63.)  Lambert rejected this offer, nor did he change the lock himself.  (*Id.* ¶ 64.)  Lambert never found his locker opened again.  (*Id.*)  Plaintiff "did not ask for the alleged sticker on his locker to be removed, nor did he try to remove it himself."  (*Id.* ¶ 65.)

### F. Lambert Is Asked to Shave

Trump's associate handbook provides that "[m]ustaches and [b]eards are acceptable if trimmed and neat and do not extend below the upper lip."  (*Id.* ¶ 24; McCabe Aff. Ex. O.)  On or about June 11, 2014, Lambert mailed a letter to Prince Sanders, the Hotel Manager of Trump, providing a doctor's note that stated that Lambert had a skin condition (the "June Doctor's Note").  (Pl.'s 56.1 ¶ 25; McCabe Aff. Ex. P.)  The June Doctor's Note stated that Lambert had been advised by his doctor to not shave his beard until his skin condition resolved.  (Pl.'s 56.1 ¶ 25; McCabe Aff. Ex. P.)

In the letter to Sanders, Lambert alleged that (1) on May 4, 2014, Calderon asked him to shave and threatened to write him up; (2) on May 11, 2014, Calderon again asked him why his hair was not trimmed, and said "this is the last time I am telling you to trim your hair off;" (3) on

May 17, 2014, Calderon again asked why he was not shaved, told Lambert that he was going to bring it up in a meeting with Sanders, and suggested that Lambert get a doctor's note; (4) on May 24, 2014, Samuel Adote, a bellman, asked Lambert why he was not shaved; (5) on that same day, Sanders asked Lambert why he was not shaved and suggested that Lambert buy ointment for his skin; and (6) on May 18, 2014, a manager named Hector told Lambert that he "must shave now." (Pl.'s 56.1 ¶ 28 (quoting McCabe Aff. Ex. Q).) Sanders forwarded the letter and the June Doctor's Note to Helen Getman, the Area Director of Human Resources, who promptly contacted Lambert to set up a meeting. (*Id.* ¶ 26.)

One week later, on June 18, 2014, Lambert met with Getman and advised her that Calderon and other Trump employees had requested that Lambert shave, despite his skin condition. (*Id.* ¶ 27.) Getman began an investigation into Lambert's allegations, interviewing Calderon, Sanders, and the other individuals identified by Lambert. (*Id.* ¶ 29.) Getman directed each individual who she interviewed to refrain from asking Lambert to shave and from engaging in discussion with Lambert on the topic of shaving. (*Id.* ¶ 30; Getman Decl. ¶ 21; Calderon Dep Tr. 26:23-27:6.)[9] Lambert does not recall being asked to shave after the meeting with Getman. (Lambert Dep. Tr. 288:14-22.) At his deposition, Lambert testified that, despite recording all incidents of alleged discrimination in a journal that he kept, he did not record being asked to shave by anyone at Trump after meeting with Getman on June 18, 2014. (*Id.* at 288:23-289:12.)

### G.     *Lambert Is Called "Gay"*

On July 3, 2014, Lambert alleged in a letter to Suzie Mills, Lambert's Hiring Manager, that a bellman at Trump called him gay. (Pl.'s 56.1 ¶ 33; McCabe Aff. Ex. W.) According to Lambert, the bellman called him gay in retaliation for Lambert's charge of discrimination with

---

[9] "Calderon Dep. Tr." refers to the Transcript of the June 2, 2016 Deposition of Francis Calderon. (Doc. 46-1.)

the Equal Employment Opportunity Commission ("EEOC"). (Pl.'s 56.1 ¶ 35.) Lambert

acknowledges that he never told the bellman that he filed the EEOC Charge, and he does not

know whether the bellman was aware of the EEOC Charge. (*Id.*)

### H. *Lambert Is Physically Threatened*

On July 14, 2014, Lambert was working with Tom Rich, a Security Supervisor at Trump.

(*Id.* ¶ 36.) Rich asked Lambert to perform a "security-related function," and it was within Rich's

job duties to assign such a function to Lambert. (*Id.* ¶¶ 36–38.) According to Lambert, Lambert

asked Rich why he was being asked to perform this security-related function, and Rich stated,

"you think you are tough, you aren't untouchable, they don't have to shoot you, you can be

paralyzed." (*Id.* ¶ 37.) Lambert did not report Rich's comments to the police or to Human

Resources. (*Id.* ¶¶ 39–41.) Two days after Rich's threat, Plaintiff met with Getman, but made

no mention of Rich's alleged threat. (*Id.* ¶ 40.) Plaintiff did not advise Trump of Rich's alleged

threat until he filed his complaint in this action. (*See id.* ¶ 41.)

### I. *Lambert Resigns*

On July 29, 2014, Lambert was injured lifting a laundry bag and took workers'

compensation leave beginning on July 29, 2014. (*Id.* ¶ 68.) From that date until March 2015,

Lambert was on workers' compensation leave. (*Id.* ¶ 72.) Between July 29, 2014 and March 12,

2015, no one at Trump made any comments to Plaintiff about his race, national original, or

disability. (*Id.* ¶ 74.) Lambert planned on returning to work up to and including February 2015,

and he felt safe returning at that time. (Lambert Dep. Tr. 302:13-304:21.) However, in March

2015, Lambert believed he could no longer return to work because he did not feel safe. (*Id.* at

303:23-304:21.) On March 13, 2015, Lambert resigned from his employment at Trump, alleging

that he was constructively discharged. (McCabe Aff. Ex. EE.)

## II.    <u>Procedural History</u>

Plaintiff commenced this action on January 26, 2015.  (Doc. 1.)  After the parties agreed to two stipulations granting Defendants additional time to answer, move, or otherwise respond to the complaint, (Docs. 6–7), Defendants filed their answers on April 17, 2015, (Docs. 9–11).

An initial pre-trial conference was held on July 15, 2015.  (Dkt. Entry July 15, 2015.)  A case management plan and scheduling order was entered into shortly thereafter, and the parties proceeded with discovery.  (Doc. 17.)

On July 13, 2016, Defendants submitted a pre-motion letter regarding their anticipated motion for summary judgment, (Doc. 32), and Plaintiff filed his response letter on July 20, 2016, (Doc. 33).  On July 27, 2016, I held a post-discovery conference, which also served as a pre-motion conference, and granted Defendants leave to file their motion for summary judgment. (*See* Dkt. Entry July 27, 2016.)

On August 18, 2016, Plaintiff sought leave to amend his complaint on consent from Defendants to add a claim of constructive discharge.  (Doc. 35.)  I granted Plaintiff leave to amend, (Doc. 36), and Plaintiff filed his Amended Complaint on August 25, 2016, (Doc. 39).

On September 12, 2016, Defendants filed the instant motion for summary judgment, accompanying memorandum of law, and supporting materials.  (Docs. 40–46.)  On October 14, 2016, Lambert filed his opposition and supporting materials.  (Docs. 47–51.)  After I granted an extension of time for Defendants to submit their reply, (Doc. 53), Defendants filed their reply and supporting materials on November 7, 2016, (Docs. 54–58).

## III.    <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

In considering a summary judgment motion, the court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and

may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation and internal quotation marks omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). Additionally, the court must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)). Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

## IV. Discussion

### A. *Discrimination Claims*

#### 1. Applicable Law

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Courts in this Circuit analyze federal and state discrimination claims together, and apply the same standard of proof with respect to both Title VII and NYSHRL claims. *See Mandell v. Cty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (analyzing Title VII and NYSHRL claims together and considering them "the same in all

relevant respects" because "in other contexts [the Courts] have applied federal standards of proof to discrimination claims under the state Human Rights Law").

Under Title VII and the NYSHRL, discrimination claims on the basis of race, national origin, and disability are analyzed under the familiar three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Crawford-Bey v. N.Y. & Presbyterian Hosp.,* No. 08 Civ. 5454(RJS), 2011 WL 4530193, at *3 (S.D.N.Y. Sept. 30, 2011) (race and age discrimination claims under Title VII and the NYSHRL); *Kumar v. N.Y.C. Sch. Constr. Auth.*, No. 10 Civ. 3559(PKC)(FM), 2011 WL 5929005, at *6–7 (S.D.N.Y. Nov. 29, 2011) (national origin claims under Title VII and the NYSHRL); *Najjar v. Mirecki*, No. 11 Civ. 5138(KBF), 2013 WL 3306777, at *4 (S.D.N.Y. July 2, 2013) (disability discrimination claims under the ADA and the NYSHRL). First, the employee bears the burden of setting forth a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. To set forth a prima facie case of discrimination, a plaintiff must show (1) he belongs to a protected class; (2) he was qualified for the position at issue; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *See id.* The Second Circuit has emphasized that the "burden of establishing a *prima facie* case is *de minimis*." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (collecting cases).

An adverse employment action is "a materially adverse change in the terms and conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). "Employment actions that [the Second Circuit has] 'deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices unique to a particular situation.'" *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). Courts in the Second Circuit have held that disciplinary action and excessive scrutiny, without additional negative consequences, do not rise to the level of adverse employment actions. *See, e.g.*, *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) (collecting cases and noting that "[w]hile plaintiff may have been reprimanded repeatedly for his lateness, nothing came of these reprimands"); *see also Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner.").

Second, if a plaintiff successfully presents a prima facie case of discrimination, the burden shifts to the defendant to proffer legitimate, non-discriminatory reasons for the adverse employment action. *See Abdu-Brisson*, 239 F.3d at 468–69. The defendant's burden at this stage is also "light." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). This burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Third, the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the proffered reason is a pretext for discrimination. *See United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013); *Holcomb*, 521 F.3d at 141. However, a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 138 (quoting *Cronin v. Aetna*

*Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see also Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("[A] plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus").

In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997). "To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks omitted), *cert. denied*, 540 U.S. 811 (2003); *see also Schnabel v. Abramson*, 232 F.3d 83, 90–91 (2d Cir. 2000) (affirming summary judgment in favor of defendant where plaintiff failed to present evidence upon which a reasonable jury could conclude that age was a "determinative factor" in adverse employment action). "Though the plaintiff's ultimate burden may be carried by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' it may often be carried by reliance on the evidence comprising the prima facie case, without more." *Cronin*, 46 F.3d at 203 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

### 2. Application

Lambert alleges that he was discriminated against in the following ways:  he was (1) denied vacation, overtime, and use of a hotel room at Trump; (2) issued a false write-up for excessive absences; and (3) assigned menial tasks. (Pl.'s Opp. 15–18.)[10]  For each claim,

---

[10] "Pl.'s Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed October 14, 2017.  (Doc. 48.)

Lambert fails to establish a prima facie case of discrimination, and there are no genuine issues of material fact as to Lambert's claims.

> i. Denial of vacation time, overtime, and hotel room requests

With respect to the denials of vacation and use of a hotel room, Defendants contend that these denials are "mere inconveniences" that do not amount to a materially adverse change in employment. (Defs.' Reply 11.)[11] Lambert raises three instances when his vacation requests were denied in November 2013 and December 2013 and three instances when his hotel room requests were denied in December 2013. Lambert also alleges that he made three requests for use of a hotel room and Trump denied these requests, while Benabou's requests during the same month were granted. Even if Lambert is correct that fewer of his requests were granted as compared to Benabou and Ahearn, (Pl.'s Opp. 16–17), denial of these requests over a two-month period does not rise to the level of an adverse employment action. *See Figueroa v. N.Y.C. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 229–31 (S.D.N.Y. 2007) (finding that denial of plaintiff's choice of vacation time did not constitute an adverse employment action); *Weisman v. N.Y.C. Dep't of Educ.*, No. 03CIV9299PKC, 2005 WL 1813030, at *7–8 (S.D.N.Y. Aug. 1, 2005) (concluding that assignment with difficult working conditions but without "diminution in benefits, title, or responsibilities" did not constitute an adverse employment action).

With respect to the denial of overtime, Defendants assert that Lambert in fact worked more overtime than his comparators in December 2013, (Defs.' Reply 11), and that the denial of six requests to work overtime from December 2013 to March 2014 does not constitute an adverse employment action, (Defs.' Reply 11–12). While "[a] deprivation of the opportunity to

---

[11] "Defs.' Reply" refers to Defendants' Reply Memorandum in Further Support of Defendants' Motion for Summary Judgment, filed November 7, 2016. (Doc. 56.)

earn overtime can be considered a materially adverse employment action," *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 217 (E.D.N.Y. 2014) (collecting cases), Lambert does not establish "any material detriment as a result of being denied overtime, such as opportunities for career advancement," *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 406 (S.D.N.Y. 2014). Furthermore, Trump's records reflect that from September 2013—the month Plaintiff filed his EEOC Charge—through March 2014, Lambert's aggregate number of overtime hours (107.5 hours) was greater than the overtime hours worked by Ahearn (98 hours), and only slightly less than the overtime hours worked by Benabou (122.25 hours). (Supp. Getman Decl. ¶¶ 4–6); *see also Lee v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 14 Civ. 5278 (KPF), 2016 WL 3542454, at *11 (S.D.N.Y. June 22, 2016) ("[An employee] does not suffer an adverse employment action with regard to overtime opportunities where the employer's overtime records show that the employee worked more overtime hours than his coworkers.") While I must construe all evidence in the light most favorable to the non-moving party and draw all reasonable inference in Lambert's favor, Lambert does not set forth any evidence contrary to Trump's figures. Lambert only disputes that Trump's figures do not amount to his actual overtime, asserting that many of Lambert's tasks during his regular shift are factored into this figure. (Lambert Aff. ¶ 9.) As an initial matter, Lambert does not supply any details to support his conclusory claim, and he does not explain how this fact, even if true, impacts his claim that he was denied overtime. In addition, this alleged distortion would be the same for Ahearn and Benabou's figures as well, and thus would have no effect on any comparison of the three employees. Accordingly, the denial of Plaintiff's vacation time, overtime, and use of a hotel room requests do not rise to the level of adverse employment actions.

## ii. False write-up

Defendants also argue that Trump's issuance of an allegedly false write-up for Lambert's excessive absences does not rise to the level of an adverse employment action. (Defs.' Reply 13.) After receiving a warning in April 2013, Lambert called out sick on July 13, 2013, August 8, 2013, and August 26, 2013, and he does not dispute that he was out sick for these days. (Pl.'s 56.1 ¶ 46.) Under Trump's policy—of which Lambert was made aware through Blando's warning in April 2013—these absences constituted grounds for disciplinary action. The write-up was thus a reasonable application of Trump's pre-existing disciplinary policy. *See Joseph*, 465 F.3d at 91 ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."). Moreover, Lambert has not alleged and there is no evidence in the record that he suffered any material alteration to his job duties as a result of the write-up, such as a demotion, decrease in salary, or suspension. Therefore, the write-up does not rise to the level of an adverse employment action. *See Bennett*, 136 F. Supp. 2d at 248.

## iii. Assignment to menial tasks

Defendants also argue that Lambert's assignment to menial tasks does not constitute an adverse employment action. (Defs.' Reply 13.) Lambert identifies only one example where he was asked to perform a menial task: in July 2014, he was asked to lift heavy boxes, which ultimately led to his on-site work injury. (Pl.'s Opp. 18.) This task, on its own, did not amount to a reduction in Lambert's overall responsibilities, and "not every unpleasant matter short of discharge or demotion constitutes an adverse action." *Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d 453, 461 (S.D.N.Y. 2007); *see also Galabya*, 202 F.3d at 640 (explaining that a materially adverse change must be "more disruptive than a mere inconvenience or an

alteration of job responsibilities" (internal quotation marks omitted)).

For the foregoing reasons, Plaintiff has not carried his prima facie burden under the *McDonell Douglas* framework as to his discrimination claims. Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's Title VII and NYSHRL discrimination claims.

### B. *Failure to Accommodate*

#### 1. Applicable Law

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Such disability-based discrimination includes failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). "A claim of disability discrimination under the New York State Human Rights Law . . . is governed by the same legal standards as govern federal ADA claims." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).

To establish a prima facie claim for failure to accommodate under the ADA or the NYSHRL, "an employee must show that: '(1) he is a person with a disability under the meaning of the ADA [or the NYSHRL]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, the employee could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'"

*Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).

Although "[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder," where an "employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Id.* at 94 (quoting *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996)).  If the proposed accommodation is "plainly reasonable," then "[t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable." *Id.*; *see also Kelly v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 15cv6309 (DLC), 2017 WL 1133433, at *3 (S.D.N.Y. Mar. 24, 2017) (explaining that where an employer has "allegedly declined to offer a reasonable accommodation . . . courts apply the [*McDonnell Douglas*] burdenshifting framework," but that if the employer has taken or offered measures to accommodate the disability, the employer is entitled to summary judgment if the accommodation is "plainly reasonable").

"A reasonable accommodation is one that 'enables an individual with a disability who is qualified to perform the essential functions of that position . . . or to enjoy equal benefits and privileges of employment.'" *Noll*, 787 F.3d at 94 (quoting 29 C.F.R. § 1630.2).  A reasonable accommodation can "take many forms, but it must be effective." *Id.* at 95; *see also Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015) ("The hallmark of a reasonable accommodation is effectiveness.").  However, an employer is "not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll*, 787 F.3d at 95; *see also* 29 C.F.R. § 1630 app. ("[T]he employer

providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.").

To prevail on a claim that a defendant failed to provide a reasonable accommodation in a timely manner, a plaintiff "prove that the failure 'was motivated by discriminatory intent.'" *Lyman v. City of New York*, No. 01 Civ. 3789(RWS), 2003 WL 22171518, at *6 (S.D.N.Y. Sept. 19, 2003) (quoting *Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 202 (S.D.N.Y. 1999)); *see also De La Rosa v. City of New York Police Dep't*, No. 09 Civ. 5290(SAS), 2010 WL 4177626, at *9 (S.D.N.Y. Oct. 22, 2010) ("To prevail on the claim that the [d]efendants failed to accommodate her request in a timely manner, [a plaintiff] must prove that the delay was motivated by discriminatory intent."), *aff'd*, 461 F. App'x 73 (2d Cir. 2012); *Hamedl v. Weiland*, No. 10-CV-2738 (SJF)(GRB), 2012 WL 3903499, at *7 (E.D.N.Y. Sept. 6, 2012) ("As plaintiff has failed to show that [defendant] failed to provide him with reasonable accommodations, or that any delay in providing those accommodations was motivated by discriminatory intent, summary judgment with respect to plaintiff's ADA claim is granted."), *aff'd sub nom. Hamedl v. Verizon Commc'ns, Inc.*, 557 F. App'x 68 (2d Cir. 2014).

### 2. Application

Lambert suffers from a skin condition known as "barber's itch" or "Folliculitis Barbae Traumatica." Defendants do not dispute that Lambert is a person with a disability under the meaning of the ADA or the NYSHRL or that Trump had notice of his disability. Instead, Defendants argue that "Trump indisputably accommodated Plaintiff's disability" through the action taken by Getman, who immediately directed Lambert's supervisors to not ask him to

shave.  (Defs.' Mem. 29; *see also* Getman Decl. ¶ 21.)[12]

Trump's accommodations are plainly reasonable as a matter of law.  As noted above, Lambert's supervisors were directed not only to refrain from asking him to shave but also to refrain from speaking to Lambert about the subject.  These accommodations enabled Lambert, who suffered from a skin condition, to "perform the essential functions" of his position.  *See Noll*, 787 F.3d at 94.

Lambert alleges that he "was not given a reasonable accommodation and was forced to continue shaving on a daily basis," (Lambert Aff. ¶¶ 48, 50), but this allegation is contradicted by his own deposition testimony.  At his deposition, Lambert testified that he could not remember anyone at Trump asking him to shave after he met with Getman.  (Lambert Dep. Tr. 288:14-290:10.)  He also testified that he kept a journal of all incidents of alleged discrimination, and that his journal did not document any instances of anyone asking him to shave after he met with Getman.  (*Id.* at 288:14-290:10.)  Therefore, to the extent that Lambert attempts to suggest that anyone at Trump continued to ask him to shave after he met with Getman, the suggestion is belied by his sworn testimony during his deposition.  Lambert cannot create a triable issue of fact by contradicting his own sworn deposition testimony.  *See, e.g.*, *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.")  Thus, the accommodations were not only reasonable, but they also had their desired effect.

Lambert also alleges that Trump delayed in making its accommodation.  Specifically,

---

[12] "Defs.' Mem." refers to the Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed September 12, 2016.  (Doc. 45.)

Lambert argues that "any action taken by [Trump] only occurred after Plaintiff was denied an accommodation request [in May 2014], and after Plaintiff suffered a severe skin irritation as a result of that request." (Pl.'s Opp. 19.) Considering the record as a whole, I find that there was no unreasonable delay in accommodating Lambert's request. In May 2014, Calderon asked Plaintiff to shave multiple times, despite knowing about his skin condition. (Pl.'s 56.1 ¶ 28.) On June 10, 2014, Lambert sent a written request for an accommodation to Sanders describing Calderon's various requests, and Sanders forwarded the letter to Getman. (*See* McCabe Aff. Ex. P; Getman Decl. ¶ 18.) Eight days from the date of Lambert's letter, Lambert met with Getman to discuss the issue. Getman immediately asked Lambert's supervisors to refrain from asking Lambert to shave. To the extent that Lambert was asked to shave in the month prior to his written request for an accommodation, Lambert has provided no evidence that this one-month delay was motivated by discriminatory intent. *See De La Rosa*, 2010 WL 4177626, at *9. Lambert attempts to infer discriminatory intent from the fact that Lambert's condition is more prevalent in African-Americans and that Lambert was asked why he could not "look more like" Christine, an Asian-American woman. (*See* Pl.'s Opp. 19–20.) However, the record shows that Trump immediately took action upon becoming aware of these allegations.

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's ADA and NYSHRL disability discrimination claims for failure to accommodate.

## C. *Retaliation*

### 1. Applicable Law

Retaliation claims under Title VII and the NYSHRL are analyzed under the *McDonnell Douglas* framework discussed above. (*See supra* Part IV.A.) Under this framework, the plaintiff must establish a prima facie case of retaliation by showing (1) participation in a protected

activity; (2) the defendant's awareness of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013). "Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Id.* at 845. After the defendants has articulated a legitimate, non-retaliatory reason for the employment action, "the presumption of retaliation arising from the establishment of the prima facie case drops from the picture," *id.*, and the "plaintiff 'must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer' for his or her Title VII claim to survive," *Villar v. City of New York*, 135 F. Supp. 3d 105, 136 (S.D.N.Y. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). The Second Circuit has explained that but-for causation "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846.

To establish a causal connection on the basis of temporal proximity, the adverse action must be "very close" in time to the protected activity. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted). The Second Circuit has not established a "bright line to define the outer limits beyond which a temporal relationship is too attenuated." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013). However, the passage of about two months between the protected activity and the adverse action appears to be the approximate dividing line. *Compare Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (finding discharge following less than two months after filing a complaint was sufficient evidence of a causal connection to preclude summary judgment), *and Lamberson v. Six W. Retail*

*Acquisition, Inc.,* 122 F. Supp. 2d 502, 512 (S.D.N.Y. 2000) (finding employee fired two months after making complaints was a sufficiently close temporal proximity to infer a causal connection), *with Hussein v. Hotel Employees & Restaurant Union, Local 6,* 108 F. Supp. 2d 360, 367 (S.D.N.Y. 2000) ("The passage of more than two months defeats any retaliatory nexus."), *vacated on other grounds*, 14 F. App'x 39 (2d Cir. 2001), *and Williams v. City of New York*, No. 11 Civ. 9679(CM), 2012 WL 3245448, at *11 (S.D.N.Y. Aug. 8, 2012) ("The passage of even two or three months is sufficient to negate any inference of causation when no other basis to infer retaliation is alleged."); *see also Breeden*, 532 U.S. at 273 (citing with approval cases holding three and four month gaps between protected activity and adverse action to be insufficient to establish causal connection).

### 2. Application

Lambert alleges that he was retaliated against in the following ways:  he (1) was issued a false write-up for excessive absences; (2) was denied vacation, overtime, and use of a hotel room; (3) had a locker vandalized; (4) was assigned an increased workload that resulted in his suffering a work-related injury; (5) was physically threatened; and (6) was called gay by another Trump employee.  For each claim, Lambert fails to establish a prima facie case of retaliation.

With respect to Lambert's claim that he was issued a false write-up for excessive absences in retaliation for his EEOC Charge, Lambert fails to establish a causal connection between the protected activity and the adverse employment action.  Lambert filed the EEOC Charge on August 26, 2013, and Trump issued Lambert a warning for his continued excessive absences on October 14, 2013.  Lambert argues that this sequence of events establishes that he was issued the warning in retaliation for the EEOC Charge.  However, Lambert does not dispute that Trump previously advised Lambert in April 2013—four months before Lambert filed the

EEOC Charge—that Lambert had "exhausted all of [his] paid sick days," and that "[a]ny employee who abuses sick leave benefits shall be subject to disciplinary action up to and including termination."[13] (McCabe Aff. Ex. Z.) Thus, Lambert fails to establish a causal connection between the EEOC Charge and the write-up, because Lambert was given his first warning regarding excessive absences months before filing the EEOC Charge.

Even if Lambert were to establish a causal connection between the protected activity and the adverse employment action, and thus establish a prima facie case of retaliation, the burden would then shift back to Trump to offer a non-retaliatory reason for the adverse employment action. After receiving the warning in April 2013, Lambert called out sick on July 13, August 8, and August 26, 2013, and he does not dispute that he was out sick for these days. (Pl.'s 56.1 ¶ 46.) Under Trump's policy—of which Lambert was made aware through the warning in April 2013—these absences constituted grounds for disciplinary action. Lambert claims that he had a doctor's note for each of these absences, but fails to articulate why this fact alters the analysis. Thus, Trump offers a valid non-retaliatory reason for the write-up, and Lambert has offered no evidence to "establish that his . . . protected activity was a but-for cause of the alleged adverse action." *Villar*, 135 F. Supp. 3d at 136 (quoting *Nassar*, 570 U.S. at 362).

With respect to Lambert's remaining retaliation claims, Lambert's only argument is that Trump's retaliatory animus can be inferred from the timing of the filing of the EEOC Charge and the adverse employment actions. (Pl.'s Opp. 21–23.) Lambert further supports this argument by asserting that these adverse employment actions were the first actual opportunity that Trump had to retaliate against Lambert. (*Id.* at 22–23.) This argument also fails to establish causation for at

---

[13] On January 2, 2013, Rosen "issued a memorandum to all associates reminding them of [Trump's] time and attendance policy," (Pl.'s 56.1 ¶ 44), which stated that "[e]xcessive sick calls (i.e. more than our allotted sick days) will result in disciplinary action," (McCabe Aff. Ex. Y).

least three reasons.

First, to establish a causal connection on the basis of temporal proximity alone, the adverse action must be "very close" in time to the protected activity. *Breeden*, 532 U.S. at 273 (internal quotation marks omitted). Here, the undisputed record establishes that (1) more than three months separate Lambert's filing of the EEOC Charge on September 5, 2013 and the denials of vacation time, overtime, and use of a hotel room in December 2013; (2) more than five months separate Lambert's filing of the EEOC Charge and Lambert's locker being vandalized on February 23, 2014; (3) more than ten months separate Lambert's filing of the EEOC Charge and Lambert's assignment of an increased workload in July 2014; (4) more than ten months separate Lambert's filing of the EEOC Charge and Lambert's assignment of an increased workload in July 2014; (5) more than ten months separate Lambert's filing of the EEOC Charge and the alleged physical threat in July 2014; and (6) more than ten months separate Lambert's filing of the EEOC Charge and when another Trump employee purportedly called him gay in July 2014. Therefore, the passage of time in each instance defeats any inference of discriminatory intent based solely on temporal proximity. *See Williams*, 2012 WL 3245448, at *11.

Second, the "first opportunity to retaliate" theory only applies where "the adverse action occurred at the first actual opportunity to retaliate." *Summa*, 708 F.3d at 128. Lambert argues that Trump's first opportunity to retaliate against Lambert was after Lambert "requested something," and thus any passage of time is mitigated by this theory. (Pl.'s Opp. 23.) However, unlike the employee in *Summa*, Lambert does not provide any explanation for why Trump's first opportunity to retaliate was in response to a request from Lambert. *Summa*, 708 F.3d at 128 ("The start of the spring season was the first moment in time when the football coaching staff could have retaliated against Summa as she was not directly working for them over the

intervening months.").  Indeed, retaliation could have occurred earlier and taken any number of other forms; therefore, the "first opportunity to retaliate" theory has no application here.

Third, Lambert does not establish that the Trump employees involved were even aware that he filed the EEOC Charge, undermining any causal connection between the EEOC Charge and these adverse employment actions.  For example, Lambert does not allege that Rich, who allegedly made the physical threat against him, was even aware that he filed the EEOC Charge. And with respect to Lambert's claim that was called gay by another Trump employee, Lambert concedes that he never told the bellman involved that he filed the EEOC Charge, and that he does not know whether the bellman was aware of the EEOC Charge.  (Pl.'s 56.1 ¶ 35.)

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's Title VII and NYSHRL claims relating to retaliation.

### D.   *Hostile Work Environment*

#### 1.  Applicable Law

"To defeat a motion for summary judgment on a claim of hostile work environment, 'a plaintiff must produce evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment.'"  *Piccone v. Town of Webster*, 511 F. App'x 63, 64 (2d Cir. 2013) (summary order) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)); *see also Terry v. Ashcroft*, 336 F.3d 128, 147–48 (2d Cir. 2003) ("[A] plaintiff must show that 'the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002))).  "Whether the challenged conduct is sufficiently severe or pervasive 'depends on the totality of the circumstances.'"  *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580

F.3d 73, 82 (2d Cir. 2009) (quoting *Cruz*, 202 F.3d at 570).  Although hostility of a work

environment is assessed considering the "totality of the circumstances," *Patane v. Clark*, 508

F.3d 106, 113 (2d Cir. 2007), "[i]t is . . . important in hostile work environment cases to exclude

from consideration personnel decisions that lack a linkage or correlation to the claimed ground of

discrimination," *Alfano*, 294 F.3d at 377.

Under both Title VII and the NYSHRL, this standard "has objective and subjective

elements:  the misconduct shown must be 'severe or pervasive enough to create an objectively

hostile or abusive work environment,' and the victim must also subjectively perceive that

environment to be abusive."  *Id.* at 374 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

(1993)); *see also Hoag v. Fallsburg Cent. Sch. Dist.*, No. 14-CV-10238 (CS), 2017 WL

3917039, at *9 (S.D.N.Y. Sept. 5, 2017) ("Like claims for discrimination under an adverse

action theory, the standard for hostile work environment claims is the same whether brought

under Title VII or NYSHRL.").  Relevant factors include "'the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance.'"

*Alfano*, 294 F.3d at 374 (quoting *Harris*, 510 U.S. at 23).  However, "it is well settled in this

Circuit that even a single act can meet the threshold if, by itself, it can and does work a

transformation of the plaintiff's workplace."  *Id.*

## 2.  Application

Lambert has failed to identify sufficient material facts demonstrating that his work

environment was objectively hostile and abusive.  The alleged incidents are either unsupported

by admissible evidence or are not sufficiently severe or pervasive to sustain a hostile work

environment claim.  Lambert's hostile work environment claim is based on many of the same

claims as his discrimination and retaliation claims, namely:

- Ahearn made racist comments to Lambert over a six-week period;

- Lambert was issued a write-up for excessive absences in October 2013;

- Lambert was denied requests for vacation, overtime, and use of a hotel room over a four-month period;

- Lambert's locker was vandalized on one occasion in March 2014;

- Trump and its employees were insensitive to Lambert with respect to his skin condition, asking him to shave multiple times in May 2014;

- A bellman at Trump repeatedly called Lambert gay in July 2014;

- A security supervisor at Trump physically threatened Lambert on one occasion in July 2014, stating "you think you are tough, you aren't untouchable, they don't have to shoot you, you can be paralyzed;" and

- Lambert's workload increased in July 2014.

(*See* Pl.'s Opp. 4–5.) The record establishes that a number of these claims were addressed and ameliorated by Trump as quickly as they occurred, and at least one—the alleged threat by Rich—was never even reported to Trump. As discussed above, (*supra* Part IV.B), upon learning of Lambert's allegations that Trump employees asked him to shave despite his skin condition, Getman immediately asked those employees to refrain from asking Lambert to shave. Lambert testified at his deposition that he did not remember being asked to shave after he met with Getman to discuss his allegations related to his skin condition. (Lambert Dep. Tr. 288:14-22.) Thus, by Lambert's own admission, the only time period in which he recalls being asked to shave was from May 4, 2014—the first time that Calderon asked him to trim his beard—to June 18, 2014—when he met with Getman to discuss his allegations.

Similarly, upon learning of Lambert's allegations that Ahearn made racist comments, Midouin immediately commenced an investigation and Trump fired Ahearn. Lambert argues

that this action was a "temporary fix" because the Union subsequently grieved Ahearn's discharge and Ahearn was reinstated to his post. However, Lambert's characterization that this disciplinary action was a "temporary fix" is disproven by the fact that Lambert fails to allege a single racial comment by Ahearn that occurred after Ahearn's reinstatement. To the extent that Lambert felt uncomfortable working the same shifts as Ahearn, Lambert does not dispute that Trump offered him the opportunity to switch to a different shift after Ahearn's reinstatement, but Lambert never applied for a different shift. (Pl.'s 56.1 ¶ 23; Lambert Dep. Tr. 114:20-116:14.)

Lambert's remaining claims do not amount to a hostile work environment because they were episodic events. *See Chukwuka v. City of New York*, 513 F. App'x 34, 36 (2d Cir. 2013) (summary order) (concluding that plaintiff's hostile work environment premised on eight specific events was not "sufficiently severe or pervasive to alter the conditions of his employment" (internal quotation marks omitted)); *Alfano*, 294 F.3d at 374 ("Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness."). These incidents were primarily one-off events, and no single incident rises to the level of a "transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374. Although these alleged incidents may have been "offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded the plaintiff's work environment." *Carter v. New York*, 151 F. App'x 40, 41 (2d Cir. 2005) (summary order) (quoting *Quinn*, 159 F.3d at 768). Thus, I conclude that Lambert has not demonstrated that Trump's conduct was severe or pervasive enough to alter the conditions of his employment.

Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's hostile work environment claim.

### E.    *Constructive Discharge*

#### 1.  **Applicable Law**

Constructive discharge occurs when "an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)).  "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff 'must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'"  *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (quoting *Suders*, 542 U.S. at 147).  "[C]onstructive discharge also requires deliberate action on the part of the employer," and something beyond mere negligence or ineffectiveness is required.  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000).  The constructive discharge standard "is higher than that for hostile work environment," *Toyama v. Hasaki Rest., Inc.*, No. 13 Civ. 4892(AKH), 2014 WL 7234602, at \*2 (S.D.N.Y. Dec. 18, 2014), and when an individual has failed to allege a hostile work environment, his constructive discharge claim based on those allegations must also fail, *see Fincher*, 604 F.3d at 725.

#### 2.  **Application**

Lambert's constructive discharge claim fails for the same reasons as his hostile work environment claim, (*supra* Part IV.D), and because Lambert fails to establish working conditions so intolerable that he felt compelled to resign, *see Fincher*, 604 F.3d at 725.  Moreover, Lambert testified at his deposition that between July 29, 2014 and March 12, 2015, no one at Trump made any comments about his race, national origin, or disability, nor did anyone at Trump take any adverse action against plaintiff based on his race, national origin, or disability.  (Pl.'s 56.1 ¶ 74.)

Thus, Lambert does not identify any discriminatory or retaliatory action in the months leading up to his resignation. This seven-month gap belies Lambert's claim that his resignation was directly tied to the discriminatory treatment that he suffered at Trump.

With regard to the alleged threat by Rich, in addition to the reasons set forth above, a reasonable jury could not return a verdict for him for constructive discharge based upon this isolated incident. Lambert did not report Rich's comments to the police or to Human Resources, (*id.* ¶¶ 39–41), and Trump did not become aware of Rich's alleged threat until Lambert filed his complaint in this action, (*see id.* ¶ 41). Moreover, Lambert's current claims of fear are not supported by the record. Lambert felt safe enough to return to work up to and including February 2015, (Lambert Dep. Tr. 302:13-304:21), but by March 2015, Lambert believed he could no longer return to work because he did not feel safe, (*id.* at 303:23-304:21). Lambert's conclusory assertion about concern for his safety is not explained by any evidence in the record. Therefore, Lambert's sudden fear of returning to work after he filed his complaint in this action cannot be a basis for his claim of constructive discharge.

Because I find no evidence that Trump or its employees "intentionally created an intolerable work atmosphere that forced [Lambert] to quit involuntarily," *Whidbee*, 223 F.3d at 74 (internal quotation marks omitted), Defendants' motion for summary judgment is granted with respect to Plaintiff's constructive discharge claim.

**F.**     *NYCHRL Claims*

Lambert also brings discrimination and retaliation claims under the NYCHRL against Trump. Having dismissed all of Plaintiff's federal claims, as well as any state law claims governed under the same standards as their federal counterparts, I decline to exercise supplemental jurisdiction over Lambert's NYCHRL claims for the following reasons.

A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Courts in this District routinely decline to exercise supplemental jurisdiction over a plaintiff's NYCHRL claims after dismissing all federal claims. *See, e.g.*, *Harris v. NYU Langone Med. Ctr.*, No. 12 Civ. 0454(RA), 2014 WL 941821, at *1–2 (S.D.N.Y. Mar. 11, 2014) (declining to exercise jurisdiction over NYHSRL and NYCHRL claims); *Algarin v. City of New York*, No. 12 Civ. 1264(LTS), 2012 WL 4814988, at *4 (S.D.N.Y. Oct. 10, 2012) (declining to exercise jurisdiction over New York Executive Law § 296 and NYCHRL claims); *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 402 (S.D.N.Y. 2011) (declining to exercise jurisdiction over NYSHRL and NYCHRL claims). Indeed, "when federal claims are dismissed early in the litigation—for example, before trial on a summary judgment motion—dismissal of state law claims is appropriate." *Karmel v. Liz Claiborne, Inc.*, No. 99 Civ. 3608IWK), 2002 WL 1561126, at *3 (S.D.N.Y. July 15, 2002) (quoting *Cobbs v. CBS Broad. Inc.*, No. 97 CIV. 8284(MBM), 1999 WL 244099, at *8 (S.D.N.Y. Apr. 26, 1999)). Furthermore, "comity counsels against exercising jurisdiction over [a plaintiff's] NYCHRL claim[s], as the NYCHRL has a lower threshold of proof than its federal counterparts and has been applied primarily at the intermediate appellate level of the state courts, with limited opportunity for the New York Court of Appeals to construe it." *Harris*, 2014 WL 941821, at *2 (internal quotation marks omitted).

I have dismissed all claims over which I had original jurisdiction, as well as any state law claims governed under the same standards as their federal counterparts. Accordingly, I decline to exercise supplemental jurisdiction over Plaintiff's NYCHRL claims, and these claims are dismissed without prejudice to filing in state court.

## V.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment with regard to Plaintiff's ADA, Title VII, and NYSHRL claims is GRANTED.  Because Plaintiff has already amended his claims and I find that any further attempt to amend would be futile, those claims are dismissed with prejudice.  Because I decline to exercise supplemental jurisdiction over Plaintiff's city law claims, those claims are dismissed without prejudice to their filing in state court.

The Clerk of the Court is respectfully directed to enter judgment for Defendants and close this case.

SO ORDERED.

Dated: March 31, 2018
      New York, New York

Vernon S. Broderick
United States District Judge